UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHRISTOPHER DRESSER                    CIVIL ACTION

VERSUS                                 NO: 98-2425

THE OHIO HEMPERY, INC., ET             SECTION: R(5)
AL.

**ORDER AND REASONS**

In this products liability case, defendants Oakmont Investment Company, Inc., American Employers' Insurance Company, and Commercial Union Insurance Company have moved for judgment on the pleadings.[1] Because the Court is collaterally estopped from reconsidering the question of whether the plaintiff's positive drug test was caused by drinking the defendants' hemp oil product without knowing that it contained THC rather than by using marijuana, the Court GRANTS defendants' motion.

---

[1]   R. Doc. 203.

## I.   Background

Plaintiff was a United States Coast Guard-licensed vessel engineer.  Before taking a Coast Guard drug test, he allegedly ingested "Hemp Liquid Gold," a product manufactured and distributed by defendant Oakmont Investment, and other similar products.  Plaintiff contends that he believed that the products were healthful and free of any ingredients that produce any of the risks associated with marijuana use.  Plaintiff later tested positive for THC, the active ingredient in marijuana.  As a result of the positive test result, the Coast Guard charged plaintiff with use of a dangerous drug and sought to have his license revoked.  A Coast Guard Administrative Law Judge ("ALJ") held hearings on the charges against Dresser in April and June of 1998.  On August 17, 1998, plaintiff sued defendants in this Court as manufacturers, markets, distributers, and sellers of certain hemp oil products, the consumption of which caused a "false positive" on the drug test.  Plaintiff seeks damages for loss of earnings, job-related benefits, and emotional distress.

In a written opinion dated February 4, 1999, ALJ Boggs ordered plaintiff's license revoked.  Dresser appealed that decision to the Commandant of the Coast Guard.  The Court stayed this matter on February 28, 2000 while the Coast Guard

proceedings against Dresser were ongoing.[2]  The Court reasoned
that if the administrative proceedings resulted in a finding that
plaintiff used marijuana, he could be collaterally estopped from
arguing otherwise in this case.  The Commandant affirmed the
ALJ's decision in June of 2002, but the National Transportation
Safety Board ("NTSB") reversed the Coast Guard's decision in June
of 2003 due to the appearance of a conflict of interest on the
part of ALJ Boggs.[3]  Dresser then moved to reopen this case
because there was no longer an administrative opinion to form the
basis of a collateral estoppel argument.

The Court reopened this case on July 2, 2003 but reissued
the stay on March 8, 2004.[4]  Plaintiff argued, in opposition to
the stay, that he would not be able to fully and fairly litigate
his hemp oil defense before the ALJ.  The relevant Coast Guard
regulation states: "If an individual fails a chemical test for
dangerous drugs under this part, the individual will be presumed
to be a user of dangerous drugs."  46 C.F.R. § 16.201(b).
Dresser argued that he would not be able to rebut this

---

[2]    R. Doc. 157.

[3]    Specifically, the ALJ's son was counsel for one of the
defendants in this civil case.

[4]    *Dresser v. Ohio Hempery, Inc.*, No. 98-2425, 2004 WL
464895 (E.D. La. Mar. 8, 2004) (R. Doc. 183).

presumption due to a policy memorandum issued to all Coast Guard ALJs by Chief Coast Guard ALJ Ingolia indicating that "accidental or inadvertent ingestion of a food product containing THC will only serve as a valid defense to a charge of use of dangerous drug if the Respondent produces reliable and credible evidence."[5]

The Court ruled that this policy memorandum, even if it has binding legal effect, does not foreclose Dresser's defense that he ingested the hemp oil product without knowing that it contained THC.[6]  The same issue arises in both this case and the administrative proceeding: whether Dresser inadvertently consumed THC by ingesting defendant's hemp oil product.  If Dresser tested positive because he used marijuana or because he ingested hemp oil knowing that it contained THC, then his license was properly revoked and he cannot sustain this products liability case.  The Court further ruled that the legal standard that Dresser must meet in the administrative proceeding to rebut the presumption that he used a dangerous drug is identical to the "preponderance of the evidence" standard he has to meet in this case.  Thus, the Court stayed these proceedings in the interest of judicial

---

[5]     R. Doc. 188, Ex. 1, *Coast Guard Chief Administrative Law Judge Memorandum*, dated Oct. 22, 2001.

[6]     *Dresser v. Ohio Hempery, Inc.*, No. 98-2425, 2004 WL 464895 (E.D. La. Mar. 8, 2004).

4

economy.  The Fifth Circuit dismissed Dresser's attempt to appeal the stay.[7]

In the meantime, the Coast Guard revocation proceeding had been reassigned to ALJ Brudzinski.  On December 7, 2004, Brudzinski held a hearing in which both sides presented additional witness testimony.  Then, on June 14, 2005, ALJ Brudzinski revoked Dresser's Coast Guard license and merchant mariner's document.[8]  Brudzinski held that Dresser failed to rebut the presumption that he knowingly ingested THC because, among other reasons, Dresser did not support his testimony that he used hemp oil with credible evidence.  Dresser appealed that decision to the Commandant of the Coast Guard, who affirmed ALJ Brudzinski's decision.[9]

Dresser also filed a separate suit against various Coast Guard ALJs, their clerks and administrative staff, and the Commandant and his legal staff for declaratory and injunctive relief, writs of mandamus, and *Bivens* actions.  Dresser maintained that ALJ Brudzinski's decision was unconstitutional because of (1) *ex parte* communications among ALJ Brudzinski,

---

[7]    *Dresser v. Ohio Hempery Inc.*, 122 Fed.Appx. 749 (5th Cir. 2004).

[8]    R. Doc. 203, Ex. B.

[9]    R. Doc. 203, Ex. C.

Chief ALJ Ingolia, and other named defendants, and (2) an
institutionalized ALJ policy to rule in favor of the Coast Guard
regarding hemp seed oil defenses to positive toxicology tests.
In that action, Judge Berrigan ruled that she could not hear
Dresser's claims under the Administrative Procedures Act because
there was no "final agency action" at that time, as the
Commandant had not yet decided Dresser's appeal of ALJ
Brudzinski's decision.[10]  The Fifth Circuit affirmed that
ruling.[11]  The Fifth Circuit also ruled that the court lacked
jurisdiction to hear plaintiff's *Bivens* claims because those
claims were "inescapably intertwined" with a review of the ALJ's
decision.[12]

After the Commandant ruled against Dresser, he filed suit
again, urging the same APA and *Bivens* claims.  Judge Berrigan
held again that she lacked jurisdiction over Dresser's APA
claims, despite the Commandant's decision in the interim, because
Dresser failed to appeal the decision of the Commandant first to
the NTSB and then to the Court of Appeals as required under 49

---

[10]     *Dresser v. Ingolia*, 07-1497, 2007 WL 3353305, at *4
(E.D. La. Nov. 8, 2007).

[11]     *Dresser v. Ingolia*, 307 Fed.Appx. 834, 840-41 (5th Cir.
2009).

[12]     *Id.* at 841-43.

U.S.C. §§ 1133 and 1153.[13]  The court also held that Dresser's *Bivens* claims remained inescapably intertwined with a review of the ALJ's decision, which could not occur without following the appeals process mandated by statute.  Dresser appealed that decision to the Fifth Circuit.

Dresser then moved that this civil case be reopened and that the stay be lifted, but the Court denied that motion on September 13, 2010.[14]  The Court noted that Dresser's appeal of Judge Berrigan's decision denying his APA and *Bivens* claims was still pending before the Fifth Circuit.  If Dresser had won that appeal, he would be able to challenge the Coast Guard's administrative proceedings directly.  The Court ruled that such an action, if allowed to proceed, would be a more appropriate vehicle for challenging the fairness of the administrative proceedings than this collateral action.

On December 22, 2010, the Fifth Circuit affirmed Judge Berrigan's second opinion and held that Dresser's failure to appeal the Commandant's decision to the NTSB precluded his APA

---

[13]    *Dresser v. MEBA Medical Benefits Plan*, Nos. 08-2662, 09-2755, 08-2663, 2010 WL 1254624 at *5-8 (E.D. La. March 24, 2010) (Berrigan, J.).

[14]    *Dresser v. Ohio Hempery, Inc.*, No. 98-2425, 2010 WL 3720420 (E.D. La. Sept. 13, 2010) (R. Doc. 196).

and *Bivens* claims.[15]  This Court then granted Dresser's unopposed motion to lift the stay in this case.[16]  Defendants now move for judgment on the pleadings on collateral estoppel grounds.

## II.  Standard

Defendants move for judgment on the pleadings under Fed. R. Civ. P. 12(c).  Both plaintiff and defendants, however, present evidence outside the pleadings, including an affidavit by a former Coast Guard ALJ and a report by the Office of Inspector General for the Department of Homeland Security.  Both parties have had a reasonable opportunity to present any material that is pertinent to the motion.  Therefore, in accordance with Fed. R. Civ. P. 12(d), the Court will treat defendants' motion as one for summary judgment under Fed. R. Civ. P. 56.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075

---

[15]    *Dresser v. MEBA Medical & Benefits Plan*, 628 F.3d 705 (5th Cir. 2010).

[16]    R. Doc. 201.

(5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may

9

satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

## III. Discussion

Defendants contend that ALJ Brudzinski, in his June 14, 2005 decision, definitively ruled that Dresser has not shown by a preponderance of the evidence that he inadvertently consumed THC by ingesting Hemp Liquid Gold.  Therefore, defendants argue, Dresser is collaterally estopped from asserting that Hemp Liquid Gold rather than marijuana caused the positive drug test. Dresser responds by arguing that he did not have a full and fair opportunity to litigate that issue in the Coast Guard's administrative system.  Dresser presents a sworn statement by a former Coast Guard ALJ which, he argues, demonstrates that ALJ

Brudzinski's decision was essentially predetermined and did not result from a fair process.  For the following reasons, the Court finds that Dresser has not demonstrated that he did not have a full and fair opportunity to litigate his hemp oil defense in the Coast Guard proceedings.  Therefore, collateral estoppel bars Dresser from arguing that he inadvertently consumed THC by ingesting Hemp Liquid Gold, and he cannot sustain this suit.

A.   *Collateral Estoppel Doctrine*

A final judgment in a federal administrative proceeding has preclusive effect when that proceeding is "judicial" in nature and the elements of collateral estoppel are met.  *See Grace v. Keystone Shipping Co.*, 805 F.Supp. 436, 441 (E.D. Tex. 1992) (Coast Guard ALJ's finding that marijuana belonged to seaman was "judicial" and had preclusive effect in later maritime action) (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991) and *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)); *see also Castillo v. Railroad Retirement Bd.*, 725 F.2d 1012, 1014 (5th Cir. 1984) (administrative determination that employee was not disabled precluded relitigation in later proceeding); *Painters District Council No. 38 v. Edgewood Contracting Co.*, 416 F.2d 1081, 1083-84 (5th Cir.

1969) (N.L.R.B. finding that union had engaged in an unfair labor practice had preclusive effect in subsequent litigation).

Collateral estoppel bars "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).  The purposes of collateral estoppel are to protect parties from multiple lawsuits, to avoid the possibility of inconsistent decisions, and to conserve judicial resources.  *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 553 (1990).  To establish collateral estoppel, a party must show: "(1) that the issue at stake [is] identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action." *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009).

ALJ Brudzinski's decision is undoubtedly judicial in nature. Moreover, the question at issue in this case - whether Dresser inadvertently consumed THC by ingesting the hemp oil product rather than by using marijuana - is identical to the issue

12

decided by ALJ Brudzinski.  That issue was actually litigated before the ALJ, and the ALJ's determination of that issue was a critical and necessary part of his decision.

Collateral estoppel applies, however, only if the party against whom the earlier decision was made had a "full and fair opportunity" to litigate the issue in those proceedings.  *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 480-81 (1982); *Utah Constr. & Mining Co.*, 384 U.S. at 422; *Rabo Agrifinance, Inc.* 583 F.3d 348 at 353.  "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."  *Kremer*, 456 U.S. at 481 (quoting *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979)); *see also Griffen v. Big Spring Independent School Dist.*, 706 F.2d 645, 654 (5th Cir. 1983) (same).  A party must meet a substantial burden in order to show that he or she did not have a full and fair opportunity to litigate an issue in an earlier proceeding.  According to the Restatement of Judgments, relitigation of an issue is not precluded when "[t]here is a clear and convincing need for a new determination of the issue . . . (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action."  Restatement

13

(Second) of Judgments § 28.  A "refusal to give the first judgment preclusive effect should not occur without a compelling showing of unfairness[.]" *Id.* cmt. j (1982).  Further, "such instances must be the rare exception, and litigation to establish an exception in a particular case should not be encouraged." *Id.* cmt. g.  Courts have followed the Restatement's approach and have strictly limited the situations in which parties may relitigate issues under the full-and-fair opportunity test. *See Montana*, 440 U.S. at 164 n.11 (citing Restatement in setting out full-and-fair opportunity test); *Otherson v. Department of Justice, I.N.S.*, 711 F.2d 267, 277 (D.C. Cir. 1983) (citing Restatement for proposition that "compelling showing of unfairness" is required); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 83 F.Supp.2d 781, 796 (E.D. Tex. 2000) (finding "no compelling showing of unfairness warranting the application of an exception to the doctrine of collateral estoppel" despite alleged discovery abuses in first case); *Shepard v. City of Batesville, Mississippi*, No. 2:04CV330-D-B, 2007 WL 108288, at *5 (N.D. Miss. Jan. 8, 2007) (requiring "compelling showing of unfairness or inadequacy in the prior litigation"); *see also* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 18 Fed. Prac. & Proc. Juris. § 4423 (2d ed.) (full-and-fair-opportunity test should not be transformed, "by sheer familiarity, into a new

14

doctrine that threatens serious corrosion of general issue preclusion values").

Litigants who were not parties to the earlier proceeding, such defendants in this case, may nonetheless assert collateral estoppel based on that proceeding.  *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1971) (permitting non-mutual defensive collateral estoppel). The full-and-fair opportunity test still applies in such a situation.  Restatement (Second) of Judgments § 29.  That said, "[w]hen a non-party invokes issue preclusion . . . greater weight may be given to the factors stated in § 28 and additional considerations may indicate the inappropriateness of imposing preclusion."  *Id.* cmt. b; *see also Otherson*, 711 F.2d at 277 (citing Restatement for this proposition).

Circumstances that courts often look to in determining whether a party had a full and fair opportunity to litigate an issue include: "(1) whether there were significant procedural limitations in the prior proceeding, (2) whether the party had an incentive to litigate fully the issue, and (3) whether effective litigation was limited by the nature or relationship of the parties."  *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001).  Dresser does not argue that any such circumstances were present in the Coast Guard revocation proceeding.  ALJ

15

Brudzinski's decision came after a hearing which in which Dresser
was represented by counsel, called and cross-examined witnesses,
introduced exhibits, received findings of fact and law on the
record, and was entitled to and did appeal.  Such procedures are
sufficient for collateral estoppel purposes.  *See Grace*, 805
F.Supp. at 441 (characterizing a Coast Guard license revocation
procedure as "elaborate" and holding that an ALJ's decision had
preclusive effect).

Rather, Dresser contends that ALJ Brudzinski's decision was
essentially predetermined because Brudzinski was not an impartial
adjudicator.  The Supreme Court has stated that "what a full and
fair opportunity to litigate entails is the procedural
requirements of due process."  *Kremer v. Chemical Const. Corp.*,
456 U.S. 461, 483 n.24 (1982) (state court decision has
preclusive effect if it meets due process); *see also Phelps v.
Hamilton*, 122 F.3d 1309, 1323 (10th Cir. 1997) (applying due
process standard in deciding whether party had full and fair
opportunity to litigate claim in prior state court proceeding in
spite of alleged judicial bias); *Dash, Inc. v. Alcoholic Beverage
Control Appeals Bd.*, 683 F.2d 1229, 1232-33 (9th Cir. 1982)
(whether state administrative proceedings provided full and fair
opportunity to litigate "merges" with the question of whether
those proceedings satisfy due process).  Therefore, in

determining whether Dresser had a full and fair opportunity to litigate the relevant issue in the Coast Guard proceeding, the Court will apply the standard for evaluating allegations of judicial bias that applies in the due process context.

Due process requires "a fair and impartial tribunal, whether at the hands of a court, an administrative agency or a government hearing officer." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1052 (5th Cir. 1997) (citing *Gibson v. Berryhill*, 411 U.S. 564, 569 (1973); *see also Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (basic principle that decisionmaker must be neutral "applies to administrative agencies which adjudicate as well as to courts").  Due process is violated if the situation "would offer a possible temptation to the average man as a judge to forget [the proper legal standard], or which might lead him not to hold the balance nice, clear, and true[.]" *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57 (1972) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).  Bias claims are "not lightly established" because they must overcome "two strong presumptions: (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest." *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) (quoting *Valley*, 118 F.3d at 1052-53). There is no violation of due process when the biasing influence

17

is "too remote and insubstantial[.]" *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980).  Courts have found due process violations in the following circumstances: "(1) where the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) where an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) when a judicial or quasi-judicial decision maker has the dual role of investigating and adjudicating disputes and complaints." *Bigby*, 402 F.3d 551, 558-59 (citing *Valley*, 118 F.3d at 1052).

B.   *Allegations of Bias*

Dresser's primary evidence in support of the position that ALJ Brudzinski did not decide his case impartially is the sworn statement of Jeffie J. Massey, a former Coast Guard ALJ.[17] Massey became the Coast Guard ALJ for New Orleans in July of 2004.[18]  Shortly after she accepted the position, Massey attended a three or four day training program along with the other active Coast Guard ALJs and other attorneys.[19]  The program included

---

[17]   R. Doc. 188, Ex. B.

[18]   *Id.* at 8.

[19]   *Id.* at 16, 20.

presentations by speakers from the National Oceanic and
Atmospheric Administration and the Bureau of Industry and
Security, as well as a presentation about drug testing.
According to Massey, the hemp seed oil defense, and the policy
memorandum on that topic issued by Chief ALJ Ingolia, were also
discussed.  Massey concluded from the training program that the
hemp seed oil defense "just wasn't a valid defense under any
circumstances."[20]  Massey also asserts that, by the end of the
week of training, it was clear that the Chief Judge's position
was that "there just shouldn't ever be a circumstance under which
you would find inadvertent use credible evidence."[21]

Massey also attended the December 7, 2004 hearing in
Dresser's administrative case that was held in front of ALJ
Brudzinski.  Massey asserts that during a lunch break, Brudzinski
"mentioned . . . the effect a ruling in favor of [Dresser] would
have on the products liability case."[22]  She also asserts that
Brudzinski "said something to the effect of, If I ruled that way,
the Chief Judge would have my job."[23]  Massey wrote a memorandum

---

[20]    *Id.* at 18.

[21]    *Id.* at 19.

[22]    *Id.* at 33.

[23]    *Id.*

at the time in which she recorded that Brudzinski said, regarding the possibility of ruling in favor of Dresser: "'Igolia [sic] would have my job if I ruled that way' . . . He was not saying this in a kidding way; he then repeated the same thing, shaking his head. . . ."[24]  In Massey's view, Brudzinski "was not an independent fact finder,"[25] and the outcome of the case was "predetermined" before any evidence was put on.[26]  Massey also states that Brudzinski's statement led her to conclude that there had been improper *ex parte* communications between the Chief Judge and ALJ Brudzinski in which the Chief Judge "directed" an outcome in favor of the Coast Guard.[27]

Massey had a long-standing conflict with Chief ALJ Ingolia and believed that the Chief ALJ had improperly communicated with her about her cases.  Massey later left the Coast Guard ALJ program because of what she describes as a "hostile work environment."[28]  Massey claims that at one meeting, "the Chief Judge started in on me about how I obviously didn't understand

---

[24]   R. Doc. 188, Ex. B-2.

[25]   R. Doc. 188, Ex. B, at 34.

[26]   *Id.* at 42.

[27]   *Id.* at 40, 75-76.

[28]   *Id.* at 81.

what the program was about and that my rulings were causing problems for his big happy family and that I needed to stop."[29] Massey asserts that the Chief Judge told her that she "should never ever make a ruling that caused the Coast Guard to do one more minute's work than they wanted to do[.]"[30]  Further, the Chief Judge allegedly told Massey that she "was the only person making trouble for him . . . and that it had to stop."[31] Massey's statement, Dresser argues, demonstrates that ALJ Brudzinski was biased and did not conduct a full and fair hearing.[32]

## C.    Failure to Appeal

Defendants argue that notwithstanding Massey's statement, Dresser is precluded from arguing that he did not have a full and fair opportunity to present his case in front of ALJ Brudzinski because he failed to appeal the Commandant's decision, which

---

[29]    *Id.* at 50.

[30]    *Id.* at 52-53.

[31]    *Id.* at 52.

[32]    Dresser also provides a report from the *Baltimore Sun* and argues that it demonstrates bias within the Coast Guard's ALJ program.  R. Doc. 188, Ex. D.  This report is inadmissible hearsay, and in any event, it relies on ALJ Massey's statement, discussed herein.

affirmed ALJ Brudzinski's decision, to the NTSB.  As the Fifth
Circuit ruled, such an appeal was the only way for Dresser to
challenge the revocation of his license.[33]

Dresser's failure to appeal the Commandant's decision to the
NTSB does not necessarily mean, however, that the Court must give
preclusive effect to that decision in this products liability
case.  The Supreme Court has made clear that "due process
requires a 'neutral and detached judge in the first instance[.]'"
*Concrete Pipe and Products of California, Inc. v. Construction
Laborers Pension Trust for Southern California*, 508 U.S. 602, 617
(1993) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57,
61-62 (1972)).  Therefore, "the possibility of reversal on
appeal" does not suffice to satisfy due process.  *Ward*, 409 U.S.
at 61-62.  If ALJ Brudzinski was not a fair and impartial
adjudicator, then the administrative proceedings violated the due
process standard, and the result of those proceedings does not
bind this Court.

Additionally, the Commandant did not preclusively rule that
ALJ Brudzinski was a fair and impartial adjudicator.  The
Commandant affirmed the ALJ's decision but did not address the
fairness concerns that Dresser now raises.  Thus, the Court is

---

[33]   *Dresser v. MEBA Medical & Benefits Plan*, 628 F.3d 705
(5th Cir. 2010).

22

not collaterally estopped from ruling on the issue of collateral estoppel itself.

D.   *Inspector General's Report*

Defendants also point to an August 2010 report by the Office of Inspector General for the Department of Homeland Security entitled "Allegations of Misconduct within the Coast Guard Administrative Law Judge Program."[34]  The report was undertaken at the request of the Vice Commandant of the Coast Guard "to assess the validity of allegations of bias in the Coast Guard ALJ program."[35]  The report focuses on former ALJ Massey's allegations concerning the Dresser case, and it also discusses her other allegations of bias within the Coast Guard ALJ program. In creating the report, the Inspector General's Office interviewed Chief ALJ Ingolia, ALJs Massey and Brudzinski, other ALJs, and senior staff members and employees.[36]  The report that has been provided is redacted, with some portions blacked out.[37]

---

[34]   R. Doc. 203, Ex. D.

[35]   *Id.* at 34.

[36]   *Id.*

[37]   The report was issued after the House of Representatives voted to transfer the Coast Guard's administrative law system to the National Transportation Safety Board in April 2008.  The bill never passed the Senate, and there

In the report, the Inspector General concludes that ALJ Massey's allegations are not substantiated.  First, the report finds that the Chief ALJ did not direct subordinate ALJs to rule in favor of the Coast Guard.[38]  Rather, according to the report, notes taken at an April 8, 2005 meeting and interviews with participants in that meeting confirm that the Chief ALJ simply instructed ALJ Massey to follow Coast Guard regulations.

Second, the report finds that ALJ Brudzinski did not prejudge the Dresser case.  Based on interviews with Brudzinski and other participants in the December 7, 2004 lunch, the report finds that Brudzinski's alleged remark that Chief ALJ Ingolia would "have [his] job" if he were to rule in favor of Dresser, if made at all, was not meant to be taken literally.[39]  In particular, Brudzinski told the investigator that he could not specifically recall his statements at the lunch but that "had he made the alleged statement or a similar remark, he was not and could not have been serious[.]"[40]  Coast Guard ALJ program staff members present at the lunch also stated that they did not

---

is no indication that it has been advanced since the Inspector General's report was issued.

[38]     *Id.* at 6.

[39]     *Id.* at 13-16.

[40]     *Id.* at 14.

remember Brudzinski's alleged comments but that he could not have meant any such comments to be taken literally.[41]  Additionally, the report notes that Brudzinski's law clerk stated that she and the ALJ spent a long time reviewing the facts in the Dresser matter and that the ALJ did not issue his opinion until six months after the hearing.[42]  The report also notes that ALJs enjoy career protections, making it unlikely that ALJ Brudzinski believed that his job was in jeopardy.[43]  The report also finds, among other things, that ALJ Massey's failure to report ALJ Brudzinski's alleged bias in the Dresser case for two years, her reporting of those allegations in this civil case rather than to the appropriate authorities, and her failure to follow Coast Guard law on multiple occasions undermines the credibility of her allegations.[44]

Dresser argues that the report should not be admitted into evidence because it is hearsay.  Federal Rule of Evidence 803(8)(C) sets out a hearsay exception for public records and reports but specifies that the exception does not apply if "the

---

[41]    *Id.*

[42]    *Id.*

[43]    *Id.* at 15.

[44]    *Id.* at 23–33.

sources of information or other circumstances indicate lack of trustworthiness."  The party opposing the admission of a government report has the burden of proving lack of trustworthiness.  *Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991).  Factors that may be useful in assessing trustworthiness include "(1) the timeliness of the investigation; (2) the special skill or expertise of the official; (3) whether a hearing was held and at what level; and (4) possible motivational problems[.]"  *Id.* (citing Advisory Committee Note, Fed. R. Evid. 803(8)(C)).

These factors are mixed as they apply to the Inspector General's report.  First, the Inspector General undertook the investigation years after the alleged events.  The report was published in August 2010, nearly six years after the December 7, 2004 hearing.  Although this lack of timeliness was caused in part by Massey's delay in making her allegations, the report was nonetheless published over three years after Massey's March 13, 2007 statement and a June 24, 2007 article in the *Baltimore Sun* detailing her allegations.[45]  By the time the report was published, ALJ Brudzinski could not recall whether he had made

---

[45]    R. Doc. 188, Ex. D.

the comments at issue.[46]  Further, the Inspector General's investigation did not require a great deal of expertise, though it did require familiarity with the Coast Guard ALJ program. *Compare Smith v. Ithaca Corp.*, 612 F.2d 215, 222 (5th Cir. 1980) (*abrogated on other grounds, Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988)) (Coast Guard marine disaster investigation report required special expertise and was not hearsay). Additionally, there is no indication that the Inspector General held a hearing in this matter.  *But see Bank of Lexington & Trust Co. v. Vining-Sparks Securities, Inc.*, 959 F.2d 606, 617 (6th Cir. 1992) (lack of hearing is not dispositive).  The record, however, reveals no reason to suspect the motivation of the Inspector General of the Department of Homeland Security, under which the Coast Guard falls.  *See Perrin v. Anderson*, 784 F.2d 1040, 1047 (10th Cir. 1986) ("we are unwilling to conclude that an internal investigation is necessarily biased, absent specific evidence.  That an investigation was conducted internally should affect the weight to be given the report, not its admissibility.").

The report also contains numerous double hearsay statements, such as ALJ Brudzinski's statement that he could not have been

---

[46]    R. Doc. 203, Ex. D, at 14.

serious if he said that the Chief ALJ would have his job if he ruled in favor of Dresser.[47]  Such "hearsay within hearsay" is not admissible unless it falls within a separate hearsay exception.  *Federal Deposit Ins. Corp. v. Mmahat*, 907 F.2d 546, 551 n.6 (5th Cir. 1990).  Brudzinski's statement does not fall within any such exception and must be excluded.[48]  Likewise, statements by staff members present at the lunch, and a statement by Brudzinski's law clerk that she and the ALJ spent months reviewing the record in the Dresser case, must be excluded.

The question is what effect this "hearsay within hearsay" has on the admissibility of the report as a whole.  *See Moss v. Ole South Real Estate, Inc.*, 933 F.2d 1300, 1310 (5th Cir. 1991) (government report may be partially admitted and partially excluded).  It is common for government reports to rely on interviews – and, therefore, on hearsay – and such reliance does

---

[47]    R. Doc. 203, Ex. D, at 14.

[48]    Although Brudzinski is recalling his state of mind, his statement does not fall under the hearsay exception of Fed. R. Evid. 803(3) because it is not a statement describing his "*then existing* state of mind" (emphasis added).  The state of mind exception to hearsay does not apply to statements in which the speaker recalls his or her state of mind at an earlier time.  *See United States v. Crosby*, 713 F.2d 1066, 1072 n.7 (5th Cir. 1983) (writing composed at another time did not go to defendant's "then existing" state of mind); Fed. R. Evid. 803(3), Advisory Committee Note (state of mind exception is "essentially a specialized application of" the present sense impression exception).

not necessarily render a report untrustworthy.  *See Moss*, 933
F.2d at 1309 (admitting report despite its reliance on hearsay
evidence).  At the same time, "the fact that the report is based
upon hearsay, particularly of an unreliable sort, is a factor
cutting against admission."  2 McCormick On Evid. § 296 n.17 (6th
ed.); *see also Moss*, 933 F.2d at 1307, n.3 ("We do not suggest
that bias may never render a report unreliable under Rule
803(8)(C)."); *Barlow v. Connecticut*, 319 F.Supp.2d 250, 258 (D.
Conn. 2004) (not admitting report when its conclusions were
"based largely on unreliable hearsay" and ignored significant
evidence); *Coughlin v. Tailhook Ass'n, Inc.*, No. CV-S-93-044-PMP,
1994 WL 780904, at *1 (D. Nev. Sept. 2, 1994) (Inspector
General's report was "replete with double hearsay" and was
inadmissible).

     In reaching the conclusion that ALJ Massey's allegations are
not substantiated, the Inspector General's report relies in part
on hearsay statements of uncertain reliability.  ALJ Brudzinski
and his staff certainly had every reason to give the Inspector
General the impression that the Dresser case was decided
impartially.  The Inspector General also relies on non-hearsay
information, such as the career protections that ALJs enjoy and
the two-year gap in which ALJ Massey did not report her
allegations of bias.  Those non-hearsay sources of information

are also available to the Court, in the form of ALJ Massey's affidavit and the laws protecting ALJs from reprisal.  The Inspector General's report has helpfully pointed the Court to some of these non-hearsay sources.  Nevertheless, the report is not sufficiently trustworthy to the extent that it contains relevant information beyond that which is already available to the Court.  *See Barlow*, 319 F.Supp.2d at 258 (excluding report when the relevant evidence was before the Court).  It is also telling that defendants point to the report but do not defend its admissibility, stating only that their purpose in presenting the report is "to show that enough time and resources have been spent on this issue; it would simply be a waste to start the process all over again in this Court."[49]  That is not the collateral estoppel standard.  The Court concludes that the Inspector General's report, to the extent that it includes information beyond that which is otherwise available to the Court, is inadmissible hearsay and does not fall within the exception for public records and reports.

*E.   Application of Full-and-Fair Opportunity Test*

---

[49]   R. Doc. 211 at 5.

After reviewing Massey's affidavit and the other evidence Dresser has presented, the Court finds that Dresser has not made a compelling showing that he lacked a full and fair opportunity to present his case in front of ALJ Brudzinski.  Dresser has not overcome the presumption that ALJ Brudzinski was an honest adjudicator, and he has failed in his attempt to show that the ALJ had a direct, personal, substantial, and pecuniary interest in the outcome of the case.  Therefore, the Court is collaterally estopped from reconsidering the question of whether Dresser's positive drug test was caused by ingesting the liquid hemp product without knowing that it contained THC rather than by using marijuana.

Dresser asserts that ALJ Brudzinski was biased, but he has not pointed to any objective flaws in the ALJ's decision that would make that purported bias apparent.  The ALJ issued his opinion over six months after the December 7, 2004 hearing, and his decision is comprehensive and reasoned.[50]  ALJ Brudzinski's finding that Dresser failed to overcome the presumption that he knowingly ingested THC is fully supported by the record.  First, the ALJ found that Dresser did not provide support for his testimony that he used the liquid hemp product before the drug

---

[50]     R. Doc. 191, Ex. 3.

test.  There were no witnesses who testified that they saw Dresser drink hemp oil in the six weeks before his positive drug test.[51]  Dresser's mother testified at the 2004 hearing that she saw Dresser drink hemp oil on one occasion before the drug test, but she apparently could not pinpoint when this occurred. Further, ALJ Brudzinski did not find her testimony credible.[52] Indeed, Massey notes in her statement that Brudzinski told her at the December 7, 2004 lunch that he did not believe Dresser's mother because she did not come forward at the earlier hearing in front of ALJ Boggs.[53]  ALJ Brudzinski also found that Dresser's mother's testimony, whether credible or not, was only a one-time observation and did not establish that hemp oil was the sole cause of Dresser's positive drug test.[54]

    ALJ Brudzinski also carefully analyzed the expert testimony that both sides presented.  That testimony indicated that THC metabolizes at different rates in different people.  Dresser failed, however, to introduce evidence of his own metabolism rate

---

[51]     *Id.* at 23.

[52]     *Id.* at 22.

[53]     R. Doc. 188, Ex. B, at 31.

[54]     R. Doc. 191, Ex. 3, at 22.

or other relevant biological factors.[55]  Brudzinski also found
that the testimony of Dresser's expert witnesses, though credible
in some respects, did not demonstrate that Dresser innocently
ingested hemp oil.  Further, Brudzinski noted that certain of
Dresser's experts inappropriately used themselves as test
subjects, which undermined the reliability of their conclusions.

ALJ Brudzinski also found that inconsistencies in Dresser's
testimony cast doubt on his credibility.  For example, Dresser
could not remember whether he stored his hemp oil supply in an
ice chest or a refrigerator,[56] and he did not attempt to explain
why he may have chosen to keep the hemp oil in an ice chest,
which would have required regular refills.[57]  Dresser also stated
that he used hemp oil to lower his risk of heart disease, but he
failed to consult a physician, change his diet, or quit
smoking.[58]  Rather, Dresser purportedly sought out hemp oil even
though other fatty acid supplements are more readily available.
Brudzinski also noted that Dresser had previously tested positive
for marijuana and observed that if Dresser did consume hemp oil,

---

[55]     *Id.* at 21.

[56]     *Id.* at 22.

[57]     *Id.* at 23.

[58]     *Id.* at 27.

he likely would have been aware that it may contain THC.[59]  For these reasons, among others, ALJ Brudzinski held that Dresser failed to rebut the presumption that he used a dangerous drug.

Against ALJ Brudzinski's thorough, reasoned decision, Dresser presents former ALJ Massey's affidavit.[60]  As discussed *supra*, Dresser must meet a high standard in order to make a compelling showing that he was denied a full and fair hearing in the Coast Guard proceeding and to overcome the presumption that Brudzinski was an unbiased adjudicator.  In particular, courts are reluctant to impute bias from judges' stray comments.  In *United States v. Gambino-Zavala*, 539 F.3d 1221 (10th Cir. 2008), for example, the judge directly told the prosecutor that he "wanted more testimony before he could give the defendant the enhancements he wanted to give him." *Id.* at 1228.  The court held that "[t]hese stray comments do not amount to actual bias" and that any appearance of bias was countered by the judge's thoughtful decision. *Id.*  In this case, Massey's actual evidence that ALJ Brudzinski was biased is limited to a single conversation in which she recalls one potentially biased comment.

---

[59]     *Id.* at 27-28.

[60]     Dresser's attorney asked Massey many improper leading questions in the course of producing the statement, and the Court will not give weight to the attorney's assertions and characterizations.

The principle that a stray comment is unlikely to demonstrate bias applies here, particularly in light of ALJ Brudzinski's thoughtful and thorough decision in this matter.

Under this standard, ALJ Massey's statement is not compelling evidence that Dresser lacked a full and fair hearing. Massey's first set of allegations is not specific to the Dresser case, but rather concerns the procedures in place for all Coast Guard mariners facing marijuana charges. After attending a training session along with the other Coast Guard ALJs and speakers from other agencies, Massey concluded that hemp oil defenses to marijuana charges would never prevail.[61] Massey's recollection of what she and the other ALJs were told at this training session is inadmissible hearsay, however, to the extent that Dresser seeks to introduce that recollection to prove the truth of whether a policy that hemp oil defenses would never prevail was in place.

Further, the specific subject of the training session was the Chief ALJ's policy memorandum on the subject of hemp oil defenses.[62] As the Court has previously determined, this policy memorandum states that a mariner facing marijuana charges may

---

[61]    R. Doc. 188, Ex. B, at 18.

[62]    R. Doc. 188, Ex. 1.

argue that he or she ingested a product such as hemp oil without knowing that it contained THC.[63]  The memorandum simply requires that a litigant provide "reliable and credible evidence" of such inadvertent consumption of THC.[64]  Massey does not point to any specific statement made at the training session that the portion of the policy memorandum allowing this defense should be totally disregarded.  Such a statement would be most unusual, and indeed implausible, in the context of a government-sponsored training session with numerous judges, attorneys, and other speakers.  Rather, Massey drew the conclusion that, in her opinion, the hemp oil defense was no longer viable in Coast Guard proceedings.  Massey's statement does not provide compelling grounds for the Court to reconsider its conclusion that the Chief ALJ's policy memorandum, even if legally effective, did not foreclose that defense.  Dresser's attorney emphasized at oral argument that the policy memorandum was in effect at the time of Dresser's hearing and that the memorandum meant what it said.  That meaning, however, is not helpful to Dresser's argument that he could not fully and fairly litigate his hemp oil defense.  Indeed, Dresser raised the hemp oil defense in front of ALJ Brudzinski, and the

---

[63]     *Dresser v. Ohio Hempery, Inc.*, No. 98-2425, 2004 WL 464895, at *5 (E.D. La. Mar. 8, 2004) (R. Doc. 183).

[64]     R. Doc. 188, Ex. 1, at 2.

ALJ carefully considered that defense before ultimately rejecting it. Thus, the Court cannot conclude that the Chief ALJ's general policy as to the hemp oil defense deprived Dresser of a full and fair opportunity to litigate the issue.

ALJ Massey also asserts that ALJ Brudzinski told her at the December 7, 2004 lunch that Chief ALJ Ingolia would "have [his] job" if he ruled in favor of Dresser. Massey concluded from this statement that there had been an actual conversation in which Ingolia instructed Brudzinski to rule against Dresser. It appears that Dresser is offering Massey's recollection of Brudzinski's statement for the truth of the matter asserted, given the conclusions that Dresser asks the Court to draw from the statement. Nevertheless, the proffered statement by ALJ Brudzinski could be used to show Brudzinski's state of mind. *See United States v. Webster*, 750 F.2d 307, 330 (5th Cir. 1984) (quoting *United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981)) (circumstantial evidence of declarant's state of mind is not hearsay and is admissible); *see also* Fed. R. Evid. 803(3) (hearsay exception for statement of declarant's then existing state of mind). Thus, the Court will not exclude this statement as inadmissible hearsay. Nonetheless, this stray and perhaps non-serious comment is not compelling evidence that ALJ Brudzinski was biased against Dresser.

37

First, ALJ Brudzinski's alleged comment is ambiguous.
Brudzinski could not have literally meant that he would be fired
if he ruled in favor of Dresser because ALJs enjoy strong career
protections.  Under 5 U.S.C. § 7521(a), an action may be taken
against an ALJ "only for good cause established and determined by
the Merit Systems Protection Board [MSPB] on the record after
opportunity for hearing before the Board."  Good cause may
include such reasons as financial irresponsibility, physical
incapacitation, and refusal to comply with administrative
procedures.  *Brennan v. Department of Health and Human Services*,
787 F.2d 1559, 1562-63 (Fed. Cir. 1986) (good cause existed when
ALJ refused to comply with standardized office procedures).  A
high rate of significant adjudicatory error may also constitute
good cause under this provision.  *Social Sec. Admin., Office of
Hearing and Appeals v. Anyel*, 58 M.S.P.R. 261, 267 (MSPB 1993)
(good cause could exist for 90-day suspension when Social
Security ALJ committed reversible error in 74 percent of
decisions).  The law is clear, however, that "reasons which
constitute an improper interference with the ALJ's performance of
his quasi-judicial functions" cannot constitute good cause in an
action in front of the MSPB.  *Brennan*, 787 F.2d at 1563.
Further, agencies are prohibited from rating the job performance
of ALJs or granting monetary or honorary awards or incentives.  5

38

C.F.R. § 930.206.  In light of these statutes, the assertion that
ALJ Brudzinski seriously felt that his job was in imminent danger
if he ruled in favor of Dresser is implausible.

Further, Massey's conclusion that Chief ALJ Ingolia directed
ALJ Brudzinski's decision against Dresser is unsupported by
evidence.  After asserting that ALJ Brudzinski "said something to
the effect of, If I ruled [in favor of Dresser], the Chief Judge
would have my job,"[65] Massey goes on to state:

> Judge Brudzinski never said, "The Chief Judge told me
> how to rule in this case," but the gist of the
> conversation was, in my professional opinion, that
> there had been conversations and the Chief Judge had
> indicated to him how the case needed to come out. . . .
> I can't draw any other conclusion from those remarks.[66]

ALJ Massey's opinion that she could reach no conclusion but that
Chief ALJ Ingolia gave ALJ Brudzinski instructions in the Dresser
case is pure speculation.  Massey admits that Brudzinski never
said that the Chief ALJ actually told him how to rule, and
Brudzinski's alleged comment that the Chief ALJ would have his
job does not purport to be a statement of what the Chief ALJ
actually told him.  It is obvious that other conclusions could be
drawn from Brudzinski's alleged statement.  For example,
Brudzinski could have made the comment without meaning it

---

[65]    R. Doc. 188, Ex. B, at 33.

[66]    *Id.*

seriously.  Even if Brudzinski was serious, the statement does
not indicate that Ingolia directed Brudzinski how to rule, and
Massey's conclusion that such direction took place is mere
speculation.  On summary judgment, the Court is not required to
accept "conclusory allegations, speculation, and unsubstantiated
assertions which are either entirely unsupported, or supported by
a mere scintilla of evidence." *Chaney v. Dreyfus Service Corp.*,
595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.,
Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 413
(5th Cir. 2003)).  Massey's assertion that Chief ALJ Ingolia
instructed Brudzinski to rule against Dresser falls into this
category, and the Court does not accept it for summary judgment
purposes.

Further, even if ALJ Brudzinski did discuss the Dresser case
with the Chief ALJ, the ABA Model Code of Judicial Conduct
specifically permits judges to consult with other judges in
carrying out their adjudicative responsibilities.  Model Code of
Judicial Conduct, Canon 3(B)(7)(c).  Massey's opinion that such
contacts are never appropriate is both irrelevant and incorrect.

Moreover, Massey's conclusion that the outcome of the
Dresser case was predetermined is contradicted by her own
statement.  In the same December 7, 2004 lunch conversation in
which Brudzinski allegedly made comments that demonstrated his

bias, Massey recounts that Brudzinski weighed the evidence with the other staff members who were present.[67]  According to Massey, Brudzinski said that he found some of Dresser's evidence to be credible but that he did not find Dresser's mother to be a credible witness because she did not come forward at the earlier hearing in front of ALJ Boggs.  Massey's conclusion that the outcome of the case was predetermined is not consistent with aspects of her own recollection of the December 7, 2004 conversation.  Thus, Massey's statement is not compelling evidence that Brudzinski did not provide Dresser with a full and fair hearing.

The deficiencies in Dresser's evidence contrast sharply with the evidence of unfairness found in *Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992).  In that case, a former city employee brought a due process claim against the government officials who terminated his employment.  The City Personnel Director who served as the hearing officer at the plaintiff's pre-termination hearing testified that he had been instructed before the hearing took place to advertise for the plaintiff's replacement.  *Id.* at 1245.  He also testified that he was given a prepared memorandum finding that the plaintiff should be terminated.  *Id.*  The

---

[67]    R. Doc. 133, Ex. B, at 31.

hearing officer stated that he "felt coerced into approving
[plaintiff's] termination because he thought his own job might be
jeopardized by finding in [plaintiff's] favor," and he ultimately
"approved the termination although he disagreed with it."  *Id.*
The court found that the plaintiff may have been denied an
unbiased tribunal and that defendants therefore were not entitled
to qualified immunity.  *Id.* at 1246.

Here, by contrast, Dresser has not shown that ALJ Brudzinski
had a direct, personal, substantial, and pecuniary interest in
the outcome of the case, or that he was biased in any other
significant respect.  The admissible parts of Massey's statement
do not constitute compelling evidence that Dresser did not
receive a full and fair hearing.

Although not necessary to the decision, the Court would be
remiss not to point out that ALJ Massey had a hostile
relationship with Chief ALJ Ingolia.  Indeed, Massey states that
as she considered Brudzinski's comments, she "couldn't help but
think about that in relation to some other problems [she] had
been having with the Chief Judge[.]"[68]  Further, in at least two
cases, the Vice Commandant reversed Massey's decisions and had to
address the possibility that Massey was biased against the Coast

---

[68]     *Id.* at 34.

Guard.  *United States Coast Guard v. Rogers*, U.S. Coast Guard
2681, 2008 WL 5765850 (Apr. 30, 2008); *United States Coast Guard
v. Elsik*, U.S. Coast Guard 2658, 2006 WL 1519584 (May 17, 2006).
Neither case was ultimately reassigned to another ALJ, but in
both cases, the Vice Commandant found that Massey committed
reversible error by ignoring clear Coast Guard law.  *See Rogers*
at 1 (Massey's dismissal of case because of Coast Guard's failure
to comply with subpoena was "unprecedented"); *Elsik* at 9-12
(Massey's dismissal of case with prejudice was error because
"[t]here can be no question but that the Coast Guard may initiate
suspension and revocation proceedings for actions that violate
statutes which provide for criminal penalties").

The Court does not need to reach these additional reasons to
find that Massey's statement is insufficient.  Nor is there any
need to reach Massey's accusations against the Chief ALJ and her
statements concerning the circumstances of her own departure.
Those statements, whether true or not, do not illuminate the
ultimate issue before the Court, which is whether ALJ Brudzinski
provided Dresser with a full and fair hearing.  On that issue, as
discussed, Massey's statement does not provide compelling
evidence of unfairness.

Thus, Dresser has not overcome the presumption that ALJ
Brudzinski was a neutral adjudicator, and he has not come forward

43

with compelling evidence that he did not receive a full and fair hearing in front of the ALJ.  Dresser is collaterally estopped from arguing that his positive drug test was caused by drinking the defendants' hemp oil product without knowing that it contained THC rather than by using marijuana.  Therefore, Dresser cannot prevail in this products liability case.

**IV.   Conclusion**

For the foregoing reasons, the Court GRANTS defendants' motion and dismisses this case.

New Orleans, Louisiana, this <u>13th</u> day of June, 2011.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

44